# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | : | CHAPTER 11 |
| | : | |
| **HUNTINGTON DEVELOPMENT, LLC,**: | | |
| | : | Case No. 10-12461 (KJC) |
| Debtor | : | (Re: D.I. 13, 93, 132). |

## MEMORANDUM[1]

## BY:  KEVIN J. CAREY, UNITED STATES BANKRUPTCY JUDGE

On August 4, 2010, Huntington Development, LLC (the "Debtor" or "Huntington") filed a petition under chapter 11 of the United States Bankruptcy Code. On August 18, 2010, RBS Citizens, N.A. ("Citizens") filed a motion to dismiss the bankruptcy case for cause pursuant to Section 1112 of the Bankruptcy Code or, in the alternative, for relief from the automatic stay pursuant to Section 362(d) of the Bankruptcy Code ("Citizens' Motion") (D.I. 13). Citizens argues that the Debtor's bankruptcy case should be dismissed because the petition was filed in bad faith and serves no valid bankruptcy purpose. Alternatively, Citizens argues that it should be granted relief from the stay because its interest in the collateral (real property) is not adequately protected, the Debtor has no equity in the property, and no reorganization is possible. The Debtor filed a response opposing the relief requested in Citizens' Motion on September 9, 2010 (D.I. 22). A hearing to consider Citizens' Motion was held on October 6 and October 21, 2010, together with the hearing on plan confirmation in a related chapter 11 bankruptcy case filed by

---

[1]This Memorandum constitutes the findings of fact and conclusions of law, required by Fed.R.Bankr.P. 7052. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a). This is a core proceeding pursuant to 28 U.S.C. 157(b)(1) and (b)(2)(A), (B) and (G).

All Land Investments, LLC ("All Land") (Bankruptcy Case No. 09-13790).[2]

On February 23, 2011, the Debtor filed an objection to the claim filed by Citizens (the "Claim Objection") (D.I. 93). Citizens filed a response to the Claim Objection on April 26, 2011 (D.I. 111). The Debtor filed a reply in support of the Claim Objection on May 4, 2011 (D.I. 115). A hearing on the Claim Objection was held on May 9, 2011.

On January 13, 2012, Citizens filed the "Motion to Allow the Admission of Additional Evidence with Respect to the Motion of RBS Citizens to Dismiss the Bankruptcy Case for Cause or, in the Alternative, for Relief from the Automatic Stay"(the "Motion for Additional Evidence") (D.I. 132). The Debtor filed an objection to the Motion for Additional Evidence on February 7, 2012 (D.I. 135) and a hearing on the Motion for Additional Evidence was held on February 14, 2012.

The following matters are currently before the Court for consideration: (i) Citizens' Motion; (ii) the Claim Objection, and (iii) the Motion for Additional Evidence. For the reasons set forth herein, Citizens' Motion will be granted. The Claim Objection will be dismissed and the Motion for Additional Evidence will be denied.

## FACTS

### The Guaranty and Suretyship Agreement and Actions after Default.

On May 30, 2006, All Land executed and delivered a Mortgage Note in favor of Citizens evidencing All Land's obligation to repay a loan in the original principal amount of $4,850,000.00 (the "All Land Note"). (Citizens Ex. 2). All Land's obligations under the All

---

[2]The transcripts of the October 6 and 21, 2010 hearing are filed in the All Land bankruptcy case at docket nos. 171 and 172. The transcripts shall be cited herein as "Tr. 10/6" or "Tr. 10/21."

Land Note are secured by a first priority mortgage on certain real property owned by All Land, known as the Old Country Farm Subdivision, located in Clayton, Kent County, Delaware. (Citizens Ex. 13).

Contemporaneously with the execution of the All Land Note and related loan documents, the Debtor executed a Guaranty and Suretyship Agreement in favor of Citizens (the "Guaranty"). (Citizens Ex. 3, Tr. 10/21 at 46:7 - 21). To secure its obligations under the Guaranty and to provide additional security for the All Land Note, the Debtor granted Citizens a mortgage lien on real property located on Wheatley's Pond Road, in Kent County, Delaware, known as the Huntington Mills Subdivision (the "Huntington Property"). (Citizens Ex. 1, Tr. 10/21 at 45:18-23).

Both All Land and the Debtor defaulted on the obligations under the All Land Note and Guaranty prior to March 2009. (Tr. 10/21 at 54:5 - 12). The Debtor consented to entry of a judgment against it and in favor of Citizens in the amount of $3,086,975.70 in the Superior Court for the State of Delaware in and for Kent County (the "Superior Court"), which judgment was recorded with the Kent County Recorder of Deeds on July 27, 2009 at Book RE, Volume 5073, Page 20, and was docketed in the Superior Court on June 23, 2009 as Judgment No. 09J-05-129 RBY. (Citizens Ex. 7, Tr. 10/21 at 54:18 - 55:8). All Land filed a petition for relief under chapter 11 of the United States Bankruptcy Code on October 29, 2009.

Thereafter, Citizens commenced a scire facias sur mortgage action in the Superior Court against the Debtor (the "Foreclosure Proceeding"). On April 13, 2010, the Superior Court granted Citizens' motion for summary judgment against the Debtor. (Citizens Ex. 8). The Debtor appealed the order granting summary judgment, but voluntarily withdrew the appeal on

June 30, 2010. (*Id.*, Tr. 10/21 at 55:17 - 23). A sheriff's sale of the Huntington Property was scheduled for August 5, 2010, but the sale was stayed by the Debtor's bankruptcy filing on August 4, 2010. (Tr. 10/21 at 55:24 - 56:7).

The Debtor's Schedules filed in this chapter 11 case listed its assets as the Huntington Property, which was valued at $2.2 million, and a bank account with $616.78. (Citizens Ex. 19, Sch. A and B). Further, the Debtor's Schedules listed one secured creditor, Citizens, with a claim in the amount of $3,086,975.70, and four unsecured creditors, with the following claim amounts: Zeccola Builders, Inc. ($398,634.34), Lawrence A. Zeccola, Sr. ($19,882.09), Parente Beard, LLC, ($2,850.00), and Gary M. Anderson, LLC ($1,500.00). (Citizens Ex. 19, Sch. D and F).

The Debtor filed a chapter 11 plan of reorganization and Disclosure Statement on November 22, 2010 (D.I. 57, 58).[3] The Debtor filed an amended plan of reorganization and amended disclosure statement on January 28, 2011 (D.I. 79, 80). The Debtor's amended plan requires the Debtor to obtain a credit facility from an "Exit Financer" to fund the cost of construction of houses on one or more of the building lots on the Huntington Property. The commitment from the proposed Exit Financer attached as Exhibit 2.2 to the Amended Disclosure Statement expired on March 30, 2011. (*Id.*).

---

[3]I take judicial notice that the Debtor filed a plan of reorganization after the hearings on October 6 and 21, 2010. Federal Rule of Evidence 201 authorizes a court to take judicial notice of an adjudicative fact that is "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed.R.Evid. 201(b).The Third Circuit Court of Appeals has decided that a court may take judicial notice of an adjudicative fact under Federal Rule of Evidence 201 that is not subject to reasonable dispute "as long as it is not unfair to a party to do so and does not undermine the trial court's fact finding authority." *In re Indian Palms Assoc.*, 61 F.3d 197, 205 (3d Cir. 1995).

**DISCUSSION**

Consideration of the Huntington Property's value is central to a decision on the outstanding Citizens' Motion and Claim Objection. The Debtor's Motion for Additional Evidence seeks to supplement the record on valuation; therefore the Motion for Additional Evidence will be addressed first.

1.    The Motion for Additional Evidence

Citizens recently filed the Motion for Additional Evidence seeking Court permission to submit an updated appraisal of the Huntington Property, which it claims will demonstrate that the property has significantly decreased in value since the Mignogna Report was prepared. The Debtor objected to the Motion, arguing that reopening the record at this time would cause undue prejudice to, and a place a substantial burden upon, the Debtor. The Debtor argues that granting the Motion for Additional Evidence would be an unnecessary expenditure of estate and judicial resources.

Whether the record should be reopened to allow a party to submit additional evidence is within the discretion of the trial court. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 331-32, 91 S.Ct. 795, 802-03, 28 L.Ed.2d 77 (1971). In deciding whether to reopen a case, the court should consider (i) the burden, if any, on the parties and their witnesses, (ii) whether undue prejudice may result if the relief is not granted, and (iii) concerns about judicial economy. *Rochez Bros., Inc. v. Rhoades*, 527 F.2d 891, 894 n.6 (3d Cir. 1975). *See also Joy Tech., Inc. v. Flakt, Inc.*, 901 F.Supp. 180, 181 (D.Del. 1995) quoting 6A James Wm. Moore et al., *Moore's Federal Practice*, §59.04[13] (2d ed. 1995) ("The trial court should consider the motion to reopen 'in light of all the surrounding circumstances and either grant or deny it in the interest of

fairness and substantial justice.'")

It is not appropriate to reopen the record in this case for additional appraisal information. The record has been closed for quite some time and the estate should not be required to bear the costs of procuring additional expert testimony on valuation. More importantly, denying the Motion for Additional Evidence will not prejudice Citizens. Citizens' proposed new evidence would reinforce the record already made by providing cumulative evidence of the depressed value of the Collateral, and would not alter my decision in this matter. This matter is ripe for adjudication and there is no benefit to expend additional judicial resources or estate resources to supplement the record. The Motion for Additional Evidence will be denied.

2.    Value of the Huntington Property

At the hearing on October 6 and 21, 2010, the Debtor and Citizens presented expert testimony regarding the value of the Huntington Property. The Huntington Property is part of the Huntington Mills Subdivision ("Huntington Mills") - - a 199 lot, single-family residential subdivision located on Wheatleys Pond Road in Clayton, Delaware (Citizens Ex. 16 (the "Mignogna Report") at 2, Debtor Ex. 1 (the "Quinn Report") at 3). The Huntington Property consists of the remaining inventory of 32 improved building lots in Huntington Mills, one of which is improved with a 3 bedroom, 2.5 bath spec dwelling that is used as a model unit and sales office. (Mignogna Report at 2).

Citizens' expert, Michael J. Acquaro-Mignogna ("Mignogna"), appraised the Huntington Property using two methods: a sales comparison/cost approach, resulting in a value of $1,670,000, and a development approach, resulting in a value of $1,680,000. (Mignogna Report at 102-03).

6

The Debtor's expert, Vincent Quinn, also utilized a sales comparison approach and a developmental approach to value the Huntington Property.[4]  Under the sales comparison approach, Quinn valued the Huntington Property at $2,080,000, and under the developmental approach, Quinn valued the property at $2,400,000.  (Quinn Report at 59, 66).

      (a)     The Sales Comparison Approach

Mignogna utilized a combined sales comparison/cost approach to value both the vacant lots and the model home. (Tr. 10/6 at 148:14 - 149:1). To value the lots, Mignogna looked to the sale prices received at five comparable developments selling approved, improved lots, and the list price for lots being sold at  two comparable developments.[5] (Id. at 149:2 - 152:24). Mignogna testified that he included the list prices for these two developments in his analysis since the list price demonstrated a ceiling price and it was unlikely the ultimate sale price would be higher.

---

    [4]Quinn described the Sales Comparison Approach as an approach that "renders an estimate of value based upon the competitive prices at which an equally desirable substitute property can be acquired in the open market." (Quinn Report at 47).  The Developmental Approach "analyzes both the physical and financial aspects of the real estate by segregating the property into its economic components; land, labor, capital, and coordination.  In doing so, a real estate developer can determine the contribution of each agent of production in the asset.  Conversely, a developer can determine how much to pay for each component." (Id.).

    [5]Mignogna identified eight competitive residential subdivision developments in Kent County that were generally similar to the Huntington Property in terms of location, access to employment and area amenities, as follows:

| Development | Builder |
| --- | --- |
| Hickory Hollow | Ryan Homes |
| Wicksfield | Puite Homes |
| Willowwood | Bestfield Homes |
| Willowwood | LC Homes |
| Willowwood | Handler Corporation |
| Willowwood | Ryan Homes |
| Providence Crossing | Benchmark Builders |
| Providence Crossing | Stonewood Builders |

(Mignogna Report at 23- 44).

(*Id.* at 152:13 -152:24). He analyzed the comparables in relation to the Huntington Property and price adjustments were made based on a number of factors, such as location, lot size, site infrastructure, and other factors. (*Id.* at 152:25 - 153:20; Mignogna Report at 85). Further, he considered the sale of multiple lots to be a superior comparable than the sale of individual lots because the Huntington Property had 32 lots to sell. (*Id.*) As a result of the sales comparison analysis, Mignogna determined a price of $50,000 per lot, which equates to a value of $1.6 million in total, but after adjustments were made for remaining site costs, the result was a value of $1,550,000.00 for the 32 lots under the sales comparison approach. (Tr. 10/6 at 154:6 - 154:12).

The value of the lots from the sales comparison approach was then brought into Mignogna's cost approach analysis, which added the value of the model home on one of the lots, resulting in a final valuation of $1,670,000.00 (Tr. 10/6 at 155:3 - 155:24; Mignogna Report at 89-90).

Quinn prepared a sales comparison analysis for the Huntington Property by looking at sales of individual improved and approved lots in the surrounding area, and found four comparables. (Tr. 10/6 at 181:3 - 182:3, Quinn Report at 48-59). In accordance with the standard procedures used by appraisers, he made adjustments to the sale price based on differences in lot size, location, and market conditions compared to the Huntington Property. (Tr. 10/6 at 182:5 - 182:15). As a result, he concluded that the appropriate price was $65,000 per lot, for a total value of $2,080,000. (*Id.* at 181:9 - 181:12, Quinn Report at 59).

(b)    The Subdivision Development Analysis Approach

Mignogna also utilized a subdivision development analysis approach to value the

8

Huntington Property, described in his report as follows:

> Subdivision Development Analysis is a valuation approach that incorporates
> projected retail pricing of dwellings on the subject lots over the time period
> anticipated to sell out the development completely.  Deductions are made for the
> carrying costs typically involved in selling out a residential development, and the
> resulting net income streams are discounted to a net present value using an
> appropriate discount rate.

(Mignogna Report at 92, Tr. 10/6 at 156:4 - 157:3). The Debtor's expert, Vincent Quinn, also

performed a subdivision development analysis.  (Quinn Report at 60 - 66).  In preparing their

cash flow analyses, both appraisers used a figure within $50,000 of each other for the total cost to

develop and sell completed units on the Huntington Property.  (Tr. 10/6 at 168:21 - 169:17,

183:20 - 183:25).  The appraisers also used the same figure of 10% for profit deduction and

similar discount rates (Mignogna used 11% and Quinn used 12%).  (*Id.* at 169:18 - 170:7, 184:1 -

184:12).  The main differences between the two subdivision development analyses was (i) the

price per house, and (ii) the absorption rate.

(i)     Average Sale Price Per House

Based on a market analysis of the best selling models at the competing developments, and

blending that price with the price for the model house appraised in the sales comparison

approach, Mignogna set the average sale price for completed houses at $234,000. (Tr. 10/6 at

157:10 - 158:3).  Considering current market conditions, he projected the sale price to remain

constant for the first 18 months, modestly increasing the sale price every six months thereafter so

the highest price at the end of the projected sales period is $238,692.00. (Tr. 10/6 at 171:18 -

172:11, Mignogna Report at 101).  The pricing did not include any increases for lot premiums,

options or upgrades.  (*Id.*)

9

Quinn set the average price per house for his cash flow analysis by looking at market conditions and the historical pricing at both Huntington Mills and the close-by Old Country Farm residential subdivision owned by All Land. (*Id.* at 185:11 - 186:2). He concluded that the base sale price for the average house to be $254,543, but recognized that in the first year of sales the builder probably would have to provide a price reduction incentive to buyers, making the sale price $241,143 for the first year. (*Id.* at 186:3 - 186:10, Quinn Report at 67). In the second year, projected prices increased to $255,479, due to improvements in the market that caused a decrease in the price reduction incentive and additional revenue from lot premiums and upgrades. (Tr. 10/6 at 186:11 - 186:20, Quinn Report at 67). In the third year of sales, prices are projected to increase even more to $288,044 as incentives are eliminated and options are added. (Tr. 10/6 at 195:8 - 195:13).

(ii)    Absorption Rate

Mignogna studied current and historical absorption rates in the marketplace in Kent County, Delaware and projected that the houses would be sold in three years, with an absorption rate of 0.67 sales per month in the first year, 1.0 sales per month in the second year, and 1.5 sales per month in the third year. (Tr. 10/6 at 159:7 - 160:6, Mignogna Report at 94). This absorption rate equates to 8 units selling in the first year, 12 units selling in the second year, and the final 12 units selling before the end of the third year. (Tr.10/6 at 172:12 - 173:16).

Quinn's appraisal projects that the units would sell more quickly, with 12 units being sold in the first year, 18 units sold in the second year, and the final 2 units selling early in the third year. (Tr. 106 at 187:3 - 187:8). Quinn's absorption rate was also prepared by analyzing market conditions based on the absorption rates at the nearby competitive residential subdivisions. (Tr.

187:15 - 189:3).

(c)    Valuation Conclusions

After reconciling the sales comparison/cost approach and the subdivision development analysis approach, Mignogna's opined that the market value of the Huntington Property as of March 19, 2010 was $1,680,000.  (Mignogna Report at 102-03).  After similarly reconciling the two approaches, Quinn opined that the market value of Huntington Property as of May 18, 2010 was $2,200,000.  (Quinn Report at 68).

After consideration of the competing appraisals of the Huntington Property, I conclude that the valuation prepared by Citizen's expert is more convincing and based on data that more accurately reflects relevant market conditions.  The Mignogna sales comparison relies on more comparables from competitive subdivisions, including multiple lot sales, which is meaningful since the Huntington Property consists of 32 lots. The Quinn appraisal's sales comparison relies on only four comparables, none of which were based on a multiple lot sale.

Moreover, the final value figure in the Mignogna Report relies mostly on the subdivision development analysis, which yields a higher value than his sales comparison/cost approach.  The parties agree that the main difference between the two appraisals' subdivision development analysis was due to the average sale price per house and the absorption rate. Mignogna's sale price per house starts at $234,000 and rose to $238,692 at the end of the projected sale period. Mignogna's price did not include increases for lot premiums or upgrades. . Mignogna testified that while the modest price increases appear conservative based on cash flows he prepared in previous years, he did not believe his approach was too conservative based on market conditions at the time of the appraisal.  (Tr. 10/6 at 158:17 - 159:6).

11

On the other hand, Quinn's sale price per house started at $241,143 in the first year and rose to $288,044 by the third year. The increase in sales prices reflects a 6% increase after the first year and a 12.75% increase after the second year, amounting to an increase of more than 19% between year one and year three. (Tr. 10/6 at 194:13 - 195:21). Quinn testified, however, that the increase in the base sale price was in line with the average increase of 3% per year; the higher percentage increase is caused by the reduction in incentives and the adding in of options and upgrades. (*Id.* at 198:20 - 199:15). Quinn noted that the price at the end of the sale period ($288,044) is a little higher, but still consistent, with the sale price Huntington Mills received for homes prior to the current economic downturn. (*Id.* at 199:16 - 200:11).

I conclude that Quinn's projected increases in the sale price per house are too optimistic, while Mignogna's more conservative approach is more plausible for the relevant development period. I reach the same conclusion with respect to Mignogna's absorption rate.

Because the assumptions in Mignogna's Report are sound, I accept the Mignogna Report as more reliable and conclude that the value of the Huntington Property as of the appraisal dates in March 2010 was $1,680,000.00.

3.    Claim Objection

On January 28, 2011, Citizens filed a secured proof of claim in the amount of $3,411,525.16, comprised of the following:

| | |
|---|---|
| Principal | $1,955,000.00 |
| Interest accrued as of 10/5/10 | $     93,863.83 |
| Late charges as of 9/30/10 | $     95,494.83 |
| Attorney fees as of 9/30/10 | $   191,000.00 |
| Appraisal fees | $     24,000.00 |
| Environmental assessment fees | $       8,200.00 |
| Face amount of outstanding letters of credit | $1,043,966.50 |
| Total | $3,411,525.16 |

12

The Debtor disputes the amount of the Citizens' claim and requests that it be reduced.
The Debtor's obligation to Citizens stems from its guaranty of the indebtedness of All Land
under the All Land Note in the original principal amount of $4,850,000.[6]  The Debtor argues that
Citizens' claim will be satisfied in full upon receipt of its interest in the real property pledged by
All Land as security for the All Land Note, known as the Old Country Farm Subdivision.  For the
reasons provided in a separate memorandum opinion issued in the All Land bankruptcy case on
this date, I concluded that the value of the Old Country Farm Subdivision ($6.5 million) is not
sufficient to satisfy All Land's obligations to Citizens, including the obligations under the All
Land Note. (*See In re All Land Inv., LLC*, Case No. 09-13790, slip op. (Bankr.D.Del. March 9,
2012)). Regardless, the terms of the Guaranty permit Citizens to enforce the Debtor's obligations
without first seeking recovery from All Land.[7]  Citizens claim will not be reduced based on the
value of the All Land real estate.

The Debtors also argue that the principal amount of Citizens' claim should be reduced
because the Confessed Judgment, dated June 23, 2009, entered in the Delaware Superior Court
listed the principal amount as $1,881,000.  (Citizens Ex. 7).  At the October 21, 2010 hearing,
Marianne Herbst, Senior Vice President of Citizens, explained that the principal was understated

---

[6]All Land is also indebted to Citizens for a separate land acquisition loan pursuant to a mortgage note in the original principal amount of $11,925,000 (the "Land Acquisition Loan").  Huntington is not a guarantor of the Land Acquisition Loan.

[7]The Guaranty provides in pertinent part: "This Guaranty is a primary obligation of Guarantor and shall be a continuing inexhaustible Guaranty.  Bank may require Guarantor to pay and perform its liabilities and obligations under this Guaranty and may proceed immediately against Guarantor without being required to bring any proceeding or take any action against Borrower, any other guarantor or any other person, entity or property prior thereto, the liability of Guarantor hereunder being joint and several, and independent of and separate from the liability of Borrower, any other guarantor or person, and the availability of other collateral security for the Mortgage Note (as defined below) and the other Loan Documents. (Citizens' Ex. 3, at 1).

in the Confessed Judgment based on an internal bookkeeping error, and that the unpaid principal under the Note was $1,995,000. (Tr. 10/21 at 58:23 - 59:15).

The Debtors further argue that certain fees listed in Citizens' claim (such as attorney fees, appraisal fees and environmental assessments) were incurred in connection with the Land Acquisition Loan given by All Land to Citizens, which the Debtor has not guaranteed. The Debtor argues that Citizens has not provided documentation to establish whether the fees apply to the guaranteed All Land Note or the (not guaranteed) Land Acquisition Note. The Debtor contends that the fees should be pro-rated so that the Debtor is responsible only for 29% of those fees, since the guaranteed note is approximately 29% of the total principal on both notes. The Debtor also argues that the Letters of Credit should not be included in Citizens' claim amount because those letters were not drawn upon and are merely contingent claims until Citizens makes payment on those letters of credit.[8]

If I accept the Debtor's remaining arguments regarding proration of the fees and elimination of the letter of credit obligations, the reduced claim amount would be:

---

[8]The Letters of Credit are described more specifically as Letter of Credit Number S906835 in the face amount of $136,181.25; Letter of Credit Number S906836 in the face amount of $136,181.25; and Letter of Credit Number S906837 in the face amount of $771,604.00. The beneficiary on all three Letters of Credit is the State of Delaware, Department of Transportation ("DelDOT"). (Citizens Exs. 4, 5, and 6).

At the February 14, 2012 hearing on the Motion for Additional Evidence, Citizens advised the Court that the Letters of Credit had expired without any draw by DelDOT. The parties agreed to submit a fact stipulation as a supplement to the record now before the Court reflecting the expiration of the Letters of Credit. However, in a telephone conference among the parties and the Court held on the record on March 7, 2012, Citizens advised that, subsequent to February 14, 2012, DelDOT attempted to draw on the Letters of Credit and, although Citizens' position is that the claim was made after the Letters of Credit expired, the possibility of litigation made it impossible for Citizens to stipulate that there are no obligations owing under the Letters of Credit.

However, even if Citizens' claim amount was either increased or reduced by the face amount of the Letters of Credit, the adjusted claim amount would not change my decision.

| | | |
|---|---|---|
| Principal | $ | 1,995,000.00 |
| Interest (as of the petition date) | $ | 84,589.29 |
| Late charges | $ | 0.00 |
| Attorney's fees as of 9/30/10 | $ | 55,390.00 |
| Appraisal fees | $ | 6,960.00 |
| Environmental assessment fees | $ | 2,378.00 |
| Outstanding letters of credit | $ | 0.00 |
| Total | | $2,144,317.29 |

This reduced amount is less than the value of the Huntington Property, which I have determined to be $1,680,000.00. Assuming, without deciding, that the Debtor's remaining arguments in favor of reducing the claim are valid, the reduced amount is not sufficient to establish any equity in the Huntington Property. Therefore, I will dismiss the Claim Objection.

4.    Citizens' Motion for Dismissal or Relief from the Stay

Bankruptcy Code §1112(b)(1) provides, in pertinent part, that, on the request of a party in interest, a court shall convert or dismiss a chapter 11 case, whichever is in the best interests of creditors and the estate, for "cause." Section 1112(b)(4) contains a non-exclusive list of what constitutes "cause," including substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation. 11 U.S.C.§1112(b)(4)(A). Citizens argues that the facts of this case clearly establish cause for dismissal.

Alternatively, Citizens seeks relief from the automatic stay pursuant to Bankruptcy Code §362(d)(1) and (2) to allow Citizens to exercise its remedies against its collateral.[9] Section 362(d)(1) and (2) provide as follows:

(d)    On request of a party in interest and after notice and a hearing, the court shall

---

[9]Although Huntington falls within the definition of a "single asset real estate" case as set forth in Bankruptcy Code §101(51B), Citizens did not seek relief under §362(d)(3). The Citizens' Motion was filed before expiration of the time to file a plan under §362(d)(3).

15

grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay--

(1)    for cause, including the lack of adequate protection of an interest in property of such party in interest;

(2)    with respect to a stay of an act against property under subsection (a) of this section, if--

    (A)    the debtor does not have an equity in such property; and

    (B)    such property is not necessary to an effective reorganization;

11 U.S.C. §362(d).  Citizens argues that it lacks adequate protection of its interest in the Huntington Property because there is no equity and the Debtor has not made any payments on the debt.  Citizens also argues that the Huntington Property is not necessary for an effective reorganization since the Debtor is not a going concern, has no income or cash, and cannot propose a confirmable chapter 11 plan.

For the reasons set forth above, I have determined that the Huntington Property's value is $1,680,000 and the amount of Citizens' secured claim is no less than $2,144,317.29.  Because there is no equity in the Huntington Property and the Debtors have no other appreciable assets, the Debtors have no ability to present this Court with a plan for an effective reorganization.  Based upon the record before me, I conclude that Citizens has met its burden of proof under §362(g)(1) and the Debtor has failed to meet its burden of proof under §362(g)(2). Citizens is entitled to relief from the automatic stay pursuant to §362(d)(1) and §362(d)(2).    Accordingly, Citizens' Motion will be granted to allow Citizens relief from the automatic stay of §362.

## **CONCLUSION**

For the reasons set forth herein, the Motion for Additional Evidence will be denied, the

Claim Objection will be dismissed, and Citizens' Motion will be granted to allow Citizens relief

from the automatic stay.

An appropriate order follows.


BY THE COURT:


_____

KEVIN J. CAREY
UNITED STATES BANKRUPTCY JUDGE


Dated: March 9, 2012